| | |
|---|---|
| **STATE FARM FIRE & CASUALTY** ) | |
| **COMPANY** *as subrogee of* **KELLY SLABACH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CAUSE NO. 3:08-CV-436** |
| ) | |
| **ELECTROLUX HOME PRODUCTS, INC.,** *a* ) | |
| *foreign corporation*, ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Plaintiff State Farm Fire & Casualty Company insured Kelly Slabach, the subrogee in this action, and her husband. In August 2006, the Slabachs' clothes dryer, which Defendant Electrolux Home Products, Inc., manufactured, caught on fire, causing considerable property damage to their home. State Farm paid for the damage and then sued Electrolux to recover the amount paid. State Farm brings strict product liability, negligence, and breach of warranty claims against Electrolux, all of which are based on its theory that the design of and warnings associated with the Slabachs' Electrolux dryer were defective and unreasonably dangerous.

In support of its theory, State Farm proffered Ronald L. Parsons as an expert. Electrolux subsequently moved to preclude Parsons from testifying. (Docket # 90.) On September 24, 2012, District Court Judge William C. Lee entered an Order pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Northern District of Indiana Local Rule 72-1(b), referring Electrolux's motion to the undersigned Magistrate Judge for a Report and

1

Recommendation.  (Docket # 117.)

For the following reasons, the undersigned Magistrate Judge will recommend that Electrolux's *Daubert* Motion to Preclude the Trial Testimony of Ronald L. Parsons (Docket # 90) be DENIED.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

On August 16, 2006, Kelly and Rodney Slabach's dryer caught fire, causing damage to their home and personal property.  (*See* Mem. in Supp. of Def. Electrolux Home Prods., Inc.'s *Daubert* Mot. to Preclude the Trial Test. of Ronald L. Parsons ("Def.'s Mem. in Supp.") 1-3.)  State Farm insured the Slabachs and paid approximately $234,825.21 for the property damage and their additional losses.  (Compl. ¶ 11.)

The Slabachs' dryer was a gas fired dryer manufactured by Electrolux.  (Def.'s Mem. in Supp. 1-2; Mem. of State Farm Fire & Casualty Co. in Opp. to Def. Electrolux Home Prods. Inc.'s *Daubert* Mot. to Preclude the Trial Test. of Ronald Parsons ("Pl.'s Mem. in Opp.") 1.)  As such, State Farm subsequently brought a subrogation action against Electrolux, alleging that the Slabachs' dryer was defectively and dangerously designed, manufactured, assembled, and sold and failed to have adequate warnings regarding the potential for the dryer to malfunction and ignite a fire.  (*See* Compl. ¶ 8.)

In furtherance of its claims, State Farm designated Ronald Parsons as its liability expert.[1] (Def.'s Mem. in Supp. 4; Pl.'s Mem. in Opp. 2.)  Parsons works for Wright Group, Inc., conducting origin and cause analysis on fires, including dryer fires; on-site investigation of fires

---

[1] Parsons's expert report is attached as both Exhibit B to Electrolux's memorandum in support of its motion (Docket # 90-3, 90-4, 90-5, 90-6, 90-7) and Exhibit A to State Farm's memorandum in opposition to Electrolux's motion (Docket # 100-1).  In the interests of clarity, the Court will refer to this report as "Parsons Report."

and explosions; investigation of products for mechanical and electrical failures; and design analysis of products as it relates to failure modes. (Parsons Dep. 9; Parsons Report App. VII at 315.) Before joining the Wright Group in 1984, Parsons worked at Eastern Investigation for five years (from 1979 to 1984), where he completed mechanical failure analysis and origin and cause analysis on automotive, residential, and commercial fires. (Parsons Dep. 6-9; Parsons Report App. VII at 315.) As such, Parsons has been professionally investigating and analyzing fires and product failures for the past 33 years. (*See* Parsons Report App. VII at 315.)

As to his formal education, Parsons attended Fitchburg State College for two years, studying industrial arts with hopes of becoming a shop teacher. (Parsons Dep. 3.) After leaving college, he started working in the automotive business, eventually earning a masters certification in automotive technology. (Parsons Dep. 4-5; Parsons Report App. VII at 315.) Parsons has had classroom education through the National Association of Fire Investigators ("NAFI") and the International Association of Arson Investigators ("IAAI") (Parsons Dep. 10); the NAFI has certified Parsons as both a Fire and Explosion Investigator and Instructor (Parsons Report App. VII at 315). Furthermore, he has spoken at and attended several professional conferences on appliance fires, mechanical failure analysis, fire science, and origin and cause analysis. (*See* Parsons Report App. VII at 316-19.)

Parsons has not, however, taken any college course in fire investigation, engineering, physics, chemistry, psychology, "human factors," safety engineering, or product design. (Parsons Dep. 11.) He received safety engineering training from Dr. Vaughn Adams in 2000, 2003, and 2004, learning safety engineering disciplines and principles, and then from Dr. John Mroszczyk, who gave a presentation at the Wright Group ratifying the principles that Dr. Adams

had taught. (Parsons Dep. 12-14.) Parsons maintains that he also received training in design and testing analysis from LP&E Laboratory, an engineering lab that specializes in risk analysis and loss prevention, and other individuals he has interacted with throughout the years, including Drs. Adams and Mroszczyk. (Parsons Dep. 18-19, 22.)

Parsons is currently employed at the Wright Group, which has been conducting extensive research into dryer fires over the past ten years and has examined dryers from all major manufacturers (Parsons Report 26), primarily on behalf of insurance companies (Parsons Dep. 17). Parsons and the Wright Group have obtained numerous exemplar Electrolux dryers, burned and unburned, to familiarize themselves with their components, operation, design, and maintenance. (Parsons Report 26.) Parsons not only dismantled and examined the Slabachs' dryer (*see* Parsons Report 9-24), but has also examined numerous exemplar Electrolux dryers using the same design and other dryers manufactured by Electrolux's competitors; conducted comparative analysis of the "old" Electrolux dryer design, which the Slabachs' dryer used, and the "new" Electrolux design; undertook operational and fire testing of dryers of various makes and models; and reviewed the user's guides, installation instructions, and services manuals associated with Electrolux dryers (Parsons Report 6). He and the Wright Group have further designed, constructed, and tested a retrofit to existing Electrolux dryers that would significantly reduce the risk of a fire due to lint accumulation. (*See* Parsons Rep. 71-76.) Parsons estimates that he spends approximately a third of his time on dryer fires. (Parsons Dep. 51-52.)

In his detailed report,[2] Parsons sets forth several conclusions and opinions, including that the Slabach fire originated within their Electrolux dryer; that the first fuel ignited was lint that

---

[2] Parsons's report was cosigned by Michael R. Stoddard, Jr., a colleague of Parsons at the Wright Group, whom State Farm's counsel has advised will not be testifying. (Parsons Report 105; Def.'s Mem. in Supp. 1 n.1.)

4

had accumulated at the gas burner and rear diffuser assembly; that this burning lint ignited secondary fuels in the dryer, including the dryer's plastic components; and the lint accumulated in the air path downstream of the drum and the clothing load. (Parsons Report 101-02.) Parsons then opines the following: (1) that the dryer caught fire because the design was defective; (2) that Electrolux failed to redesign the dryer to eliminate the fire hazard; and (3) that Electrolux failed to warn users of purportedly known fire hazards. (*See* Parsons Report 102-04.)

Specifically, Parsons opines that the dryer was unreasonably dangerous because "Electrolux's design inefficiently manages the lint produced during the drying process and allows for lint to accumulate in areas where it is in close proximity or direct contact with the heat source of the dryer." (Parsons Report 103.) As to the design, Parsons concludes that "the lint that is produced in the Electrolux design collects in areas that are not visible to, or serviceable by, the average user" and that the design is defective because it is constructed using some combustible, plastic components instead of steel ones. (Parsons Report 103-04.) And finally, Parsons opines that "[t]he warnings on the dryer do not advise the user that lint collects near the heat source and can be a fire hazard." (Parsons Report 104.) Ultimately, Parsons concludes that the design and warnings related to this dryer are unreasonably dangerous. (Parsons Report 104.)

On March 1, 2012, Electrolux moved to exclude Parsons from testifying at trial, arguing that he is not qualified to opine that (1) the Slabachs' dryer was defective; (2) Electrolux is liable for failing to redesign the dryer; and (3) Electrolux's warnings were insufficient. (Docket # 90.) Electrolux further argues that Parsons's methodology is unreliable and that his opinions will not assist the trier of fact. (*See* Def.'s Mem. in Supp. 17-22.) State Farm responded (Docket # 100), countering Electrolux's arguments and pointing to other cases where federal courts have

permitted Parsons to testify on the same issues present here (Docket # 114).

# III.  APPLICABLE LAW

The admissibility of expert evidence is governed by Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny.  *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007).  Rule 702 provides that following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

*Daubert* requires a district court to exercise a "gatekeeping" function to ensure that expert testimony is both reliable and relevant pursuant to Rule 702.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010); *see generally Daubert*, 509 U.S. at 589-92; *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006); *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003).  This inquiry applies not only to scientific testimony, "but to all kinds of expert testimony." *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002) (noting that Rule 702 "makes no distinction between 'scientific' knowledge and other forms of specialized knowledge" (citing *Kumho Tire*, 526 U.S. at 149)).  The fundamental purpose of the gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

According to the Seventh Circuit Court of Appeals, to gauge reliability, "the court is to determine whether the expert is qualified in the relevant field and . . . examine the methodology the expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). When determining whether an expert is qualified, the court should consider his "full range of practical experience as well as academic or technical training . . . ." *Trs. of Chi. Painters & Decorators Pension v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 788 (7th Cir. 2007) (quoting *Smith*, 215 F.3d at 718). Nevertheless, "[a] court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter . . . . [T]he court's gatekeeping function [also] focuses on an examination of the expert's methodology." *Smith*, 215 F.3d at 718; *see also Winters*, 498 F.3d at 742. Accordingly, "[an] expert['s] work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). The court's focus must be solely on the principles and methodology the expert used and not on the conclusions generated. *Winters*, 498 F.3d at 742; *see also Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . .").

Specifically, *Daubert* outlined the following, non-exhaustive factors to guide district courts in assessing an expert's methodology:

> (1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community.

*Bielskis v. Lousiville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (quoting *Daubert*, 509 U.S. at 593-94). At the same time, this inquiry is fact-dependent and flexible; the district court is given "wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (quoting *Bielskis*, 663 F.3d at 894).

But even if an expert's testimony is deemed reliable, it must be excluded if it is not relevant, which means under Rule 702 that it is not likely "to assist the trier of fact to understand the evidence or determine a fact in issue . . . ." *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996); *see also United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007). Stated another way, "the suggested . . . testimony must 'fit' the issue to which the expert is testifying." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (quoting *Porter v. Whitehall Labs. Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)). If the proposed expert testimony satisfies the *Daubert* threshold of both relevance and reliability, "the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596). "The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence." *Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 921 (N.D. Ind. 2006).

## IV. DISCUSSION[3]

Electrolux challenges Parsons's qualifications, the reliability of his methodology, and the relevancy of his opinions. None of Electrolux's arguments, however, warrant precluding Parsons from testifying at trial.

### A. Parsons is Sufficiently Qualified

One of Electrolux's main objections to Parsons's qualifications to opine as to the defective design of and warnings associated with the Slabachs' dryer is that he has no formal education in engineering, physics, chemistry, psychology, human factors, safety engineering, or product design. (Def.'s Mem. in Supp. 5, 14.) But "[a] witness may qualify as an expert even if the opposing counsel can point to deficiencies in his or her qualifications." *Traharne v. Wayne/Scott Fetzer Co.*, 156 F. Supp. 2d 697, 706 (N.D. Ill. 2001).

Moreover, Rule 702 allows a witness to be "qualified as an expert by knowledge, skill, experience, training, *or* education." *Metavantee Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (emphasis added) (quoting FED. R. EVID. 702). Therefore, "[a]n expert need not have particular academic credentials to be 'qualified,' but rather 'anyone with relevant expertise

---

[3] A district court enjoys wide latitude in performing its gatekeeping function and deciding how to determine the reliability of an expert's testimony. *Bielskis*, 663 F.3d at 894; *In re Syed*, 238 B.R. 133, 142 (N.D. Ill. 1999). As such, a *Daubert* hearing was not held on this motion as the record was sufficient to allow the Court to decide the *Daubert* issues without one. *Olinger v. U.S. Golf Ass'n*, 52 F. Supp. 2d 947, 948 (N.D. Ind. 1999); *accord Mitchell v. Iowa Interstate RR Ltd.*, No. 07-1351, 2010 WL 2179715, at *3 (C.D. Ill. May 26, 2010) (finding that a *Daubert* hearing was not required where the record was more than adequate to conduct a *Daubert* examination without a hearing); *see also In re Syed*, 238 B.R. at 142 (stating that a court is not required to hold a full *Daubert* hearing each time a party offers expert testimony). The parties do not indicate why such a hearing is necessary or what missing information a hearing would supply, and, according to the Seventh Circuit, this Court is not required to conduct a *Daubert* hearing. *See Target Mkt. Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 n.3 (7th Cir. 1998) (finding that nothing in *Daubert* suggested that district courts be required to conduct *in limine* hearings concerning every proffer of expert testimony and that a hearing was not necessary when the district court had the expert's report and all the documents upon which the report drew before it and the movant did not indicate what missing information a hearing would supply); *see also Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067-68 (7th Cir. 1998) (holding that "the district court had a sufficient basis for her decision without holding a hearing" and that "[w]e have not required that the *Daubert* inquiry take any specific form").

enabling him . . . to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness.'" *Lemmermann v. Blue Cross Blue Shield*, 713 F. Supp. 2d 791, 797 (E.D. Wis. 2010) (quoting *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)).  As such, Parsons's lack of formal, college education in engineering, physics, chemistry, psychology, human factors, safety engineering, or product design does not render him unqualified, particularly when he has classroom education from NAFI and IAAI courses, is certified by the NAFI as both a Fire and Explosion Investigator and Instructor, and has attended and spoken at several professional conferences on appliance fires, mechanical failure analysis, and fire science.  (*See* Parsons Report App. VII at 316-19.)

And, regardless, "[w]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience."  *Smith*, 215 F.3d at 718 (internal quotations and citations omitted); *see Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Conn*, 297 F.3d at 556 (stating that "genuine expertise may be based on experience or training").  Here, Parsons has been engaged in the professional investigation and analysis of fires and product failures for 33 years, first completing mechanical failure analysis and origin and cause analysis at Eastern Investigation for 5 years (Parsons Dep. 6-9; Parsons Report App. VII at 315), and then moving to the Wright Group in 1984, where he has examined hundreds of dryers from all major manufacturers, spent thousands of hours conducting experimental testing on dryer operation and failure modes, and currently spends a third of his time on dryer fires (Parsons Report 26; Parsons Dep. 51-52; *see* Parsons Report 26-

32, 97-98).

Parsons has also dismantled, thoroughly examined, and documented hundreds of Electrolux dryers, both electric and gas models, which are of a similar design to that of the Slabachs' dryer (the "ball hitch" design), and, in doing so, has become very familiar with their component parts. (Pl.'s Mem. in Opp. 6; *see* Parsons Report 26-33.) Parsons has also extensively examined dryers manufactured by other companies, including Whirlpool and Maytag, which utilize a "bulkhead" design, and compared it to Electrolux's "ball hitch" design. (*See* Parsons 48-58.) From this comparative analysis, Parsons concluded that the Electrolux dryer design used in the Slabachs' dryer and similar models accumulated substantially more lint in critical areas where it was more probable that a fire would originate than Whirlpool's and Maytag's alternative designs. (Parsons Report 59.) He has further examined Electrolux's "new" dryer design, which uses a bulkhead design similar to that used by Whirlpool and Maytag. (*See* Parsons Report 59-64.) Because of his extensive experience dismantling and analyzing different dryer designs, including the Slabachs' dryer; his background investigating fires and product failures for 33 years and counting; and his formal and informal training, Parsons is qualified to opine about the design of the Slabach dryer, the relevant differences between that design and other dryer designs and between that design and the "new" Electrolux dryer design, and the purported defects he sees in the Electrolux design that led to the Slabachs' dryer fire.

Electrolux further takes issue with the experience Parsons does *not* have—he never worked for a consumer product manufacturer or as a mechanical or design engineer—while minimizing the experience he *does* have—dismantling numerous exemplar dryers, including hundreds of Electrolux dryers that used a similar design as the Slabachs' dryer; comparing

Electrolux's "old" design to its "new" design and other manufacturers' designs; and reviewing Electrolux's service manuals, instructions, and user's guides. "[I]n determining whether a witness is a qualified expert, a court should compare the subject area where the witness has superior knowledge, skill, experience, or education with the subject matter that the witness will be called to testify about." *Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 690, 693-94 (N.D. Ill. 2001) (citing *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)); *accord Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir. 1999).

Here, Parsons has considerable knowledge and experience extensively examining and analyzing different dryer designs and the ramifications of those designs as they relate to fires. "Once a witness passes the threshold of knowledge, skill, experience, training, or education to qualify as an expert," as Parsons has done here, "any shortcomings or deficiencies which he or she possesses are reserved for cross-examination." *Wayne/Scott Fetzer Co.*, 156 F. Supp. 2d at 706.; *see also Bourke v. Ford Motor Co.*, No. 2:03-CV-136, 2006 WL 3833324, at *2 (N.D. Ind. Dec. 27, 2006). As such, Parsons is qualified to opine as to dryer design and defect. Electrolux's various challenges to his qualifications beyond this threshold level of knowledge and experience are properly the subject of cross-examination. *See Wayne/Scott Fetzer Co.*, 156 F. Supp. 2d at 706.

As to Parsons's opinions about the warnings associated with the Slabachs' dryer, Electrolux argues that Parsons is not qualified to testify "in the areas of human information processing." (Def.'s Mem. in Supp. 16.) State Farm clarifies that Parsons does not intend to offer any opinions on warnings related to the field of "human factors," but only as to the impropriety of Electrolux's use of product literature as a solution to a product design hazard.

(Pl.'s Mem. in Opp. 8.)  State Farm further contends that because Parsons has examined labels affixed to Electrolux dryers, including the Slabachs' dryer, and has researched and analyzed the user's guides and services manuals associated with Electrolux dryers, he is qualified to testify concerning the hazard that caused the fire in the Slabachs' dryer, what the labels and instructions associated with that dryer did or did not say about the hazard, and what information other labels and instructions associated with other Electrolux dryers contain.  (Pl.'s Mem. in Opp. 8.)

Importantly, Parsons does not offer any opinions based on "human factors,"[4] such as the propriety of a warning's color, font, or style.  Rather, he states that "[t]he warnings on the dryer do not advise the user that lint collects near the heat source and can be a fire hazard" and then explains why he believes including recommendations for installation in the installation guide and for periodic maintenance in the user's guide are improper solutions to this hazard.   (Parsons Report 104-105.)  Thus, Parsons "seeks to opine that the dryer is defective due to the lack of *any* warning on the product itself."  *State Farm Fire & Cas. Co. v. Electrolux N. Am.*, No. 2:10-CV-01147 RSM, 2011 WL 6753140, at *3 (W.D. Wash. Dec. 23, 2011) (emphasis in original).  He "does not purport to opine on how the warning should be worded or how it should appear in order to effectively convey its message to [the user]."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 245 (3d Cir. 2008).  He will simply discuss and analyze the warnings to the extent they fail to warn of the purportedly defective design that allows lint to accumulate near the heat source and how such a warning is one possible solution to the safety engineering problem.

While Parsons could certainly have more qualifications to opine in this area, "[t]he requirement that an expert be qualified by knowledge, skill, experience, education or training

---

[4] "Human factors is a discipline that incorporates a study of human behaviors, limitations and capabilities into the design of products, systems and equipment."  *Winters*, 498 F.3d at 741.

should not be viewed as being particularly rigorous." *Wayne/Scott Fetzer Co.,* 156 F. Supp. 2d at 706. Indeed, "an adequately qualified witness need not specialize in the field in which the opinion is offered." *Norwest Bank, N.A. v. Kmart Corp.*, No. 3:94-CV-78RM, 1997 WL 33479072, at *2 (N.D. Ind. Jan. 29, 1997) (citing *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 783 (3d Cir. 1996)); *see also Dairyland Power Coop. v. United States*, No. 04-106 C, 2008 WL 5122339, at *10 (Fed. Cl. June 20, 2008) ("An expert need only be qualified and need not be the best and the brightest for testimony to be admissible."); MATTHEW BENDER & CO., INC., FEDERAL RULES OF EVIDENCE MANUAL § 702.02 (2012) ("[C]ourts have not required a party to show that the witness is an outstanding expert, or to show that the witness is well-known or respected in the field; these are generally questions of weight."). Accordingly, Parsons is sufficiently qualified to give his limited opinions on warnings.

Furthermore, Parsons's colleague, Michael R. Stoddard, Jr., who co-authored Parsons's report, was recently deemed qualified in *State Farm Fire & Casualty Co. v. Electrolux Home Products, Inc.*, No. 1:10-cv-3901 (E.D.N.Y. Aug. 22, 2012) (attached as Ex. 1 to Docket # 114), to give the same opinions that Parsons offers in this case despite the fact that, like Parsons, Stoddard lacked an engineering background or any training, education, or experience in product design (*see* Docket # 114-1 at 4). Stoddard was further permitted to give the same opinion on warnings that Parsons seeks to offer here; in both cases, the experts are simply giving a "general opinion that one of the ways to address this type of problem could be from a proper instruction from the manufacturer to the consumer without [opining] as to the particular form or style or language of the exact instruction" (Docket # 114-1 at 6). Therefore, based upon his specialized knowledge of dryer design, operation and failure modes, and safety principles applicable to dryer

manufacturers, Parsons is qualified to give such an opinion.[5] *See Pineda*, 520 F.3d at 245 (holding that, because the expert's testimony about warnings was not what the precise language, font, or color should be, but rather that a proper instruction was a possible solution to an engineering safety problem, the expert was qualified to offer such testimony based on his qualifications as a design expert).

Moreover, Parsons has been explicitly deemed qualified to offer the same opinions on defective design and warnings by one other federal court, *see Phila. Contributionship Ins. Co. v. Electrolux, Inc.*, No. 2:10-cv-2045, Docket # 69 (attached as Ex. F to Pl.'s Mem. in Opp.) (E.D. Pa. Oct. 3, 2011) (order denying defendant's motion to exclude Parsons), Docket # 77 at 31 (noting that Parsons has a "reasonable expert foundation of dryers, of appliances of that nature"), Docket # 77 at 33 (stating that Parsons is qualified by "virtue of [his] education and experience to be an expert because [he] knows a lot more than I do, or the average juror is going to know about dryers"), and deemed qualified to offer opinions as to a dryer's design defects in another, *see Rager v. Gen. Elec. Co.*, No. 1:08-cv-1482, 2010 WL 5393857, at *9 (M.D. Pa. Dec. 22, 2010) (finding Parsons qualified and denying motion to exclude his expert testimony). In finding Parsons qualified, the *Rager* court specifically noted Parsons's more than 30 years of professional experience, more than 3,000 fire investigations, his professional certifications, and his extensive examinations and testing of dryers, including more than 1,000 hours of testing

---

[5] Electrolux argues that Parsons does not have adequate knowledge of safety engineering principles because all his training came from reviewing the safety engineering disciplines and principles of others. (Def.'s Mem. in Supp. 14.) But even if his knowledge came from informal training from others more-versed in safety engineering, Parsons still has superior knowledge in that area, and, when comparing that knowledge to his opinions on warnings, he is qualified to render such opinions. *See Jones*, 188 F.3d at 723; *Wayne Scott Fetzer Co.*, 156 F. Supp. 2d at 693-94.

related to lint accumulation and ignition.[6]  *Id.*  Therefore, Parsons is qualified to render the opinions offered in this case.[7]

## B. Parsons's Methodology Is Reliable

Electrolux next challenges the reliability of Parsons's opinions, arguing that they are not based on sufficient facts and data or a reliable methodology.  (*See* Def.'s Mem. in Supp. 17-21.)

Federal Rule of Evidence 702 requires that an expert's testimony be "based on sufficient facts or data."  FED. R. EVID. 702(b).  Here, Parsons has dismantled and analyzed at least 141 exemplar Electrolux dryers that were involved in fires (Parsons Report 95); has dedicated a significant portion of his time over the last ten years to investigating dryer fires, identifying and examining exemplar dryers, analyzing dryer designs, and testing dryers (Parsons Dep. 51-52); *Rager*, 2010 WL 539857, at *9; and, as the *Rager* court noted, has conducted over one thousand hours of testing on his lint ignition theory, *id.*; (*see* Parsons Report 100 ("[T]he Wright Group . . . [has] conducted thousands of hours of independent [ ] analysis and testing of burned and unburned Electrolux dryers . . . .")).  Considering Parsons's extensive research and testing, his opinions are based on sufficient facts and data.  Electrolux's challenges to the content of

---

[6] Although Electrolux argues that the *Rager* court limited Parsons's qualifications solely to the fire's cause and origin (*see* Def.'s Mem. in Supp. 17 n.11), a review of the opinion and briefs in that case reveals that Parsons also rendered unchallenged opinions as to design defects and alternative designs, *see Rager*, 2010 WL 5393857, at *7 ("Parsons's expert report also discusses alternative designs for the GE dryer which eliminate the potential for a fire caused by accumulation of lint in proximity to the heat source.").  It is unclear whether Parsons also opined as to the warnings associated with the dryer at issue.

[7] And despite Electrolux's argument to the contrary (Def.'s Mem. in Supp. 15-16), Parsons's affidavits in other cases concerning dryer exhaust venting material do *not* contradict his report or testimony in this case.  In those affidavits, Parsons was opining as to the threat caused by using flexible foil vents in dryers. (*See* Def.'s Mem. in Supp. Ex. C at ¶ 18, Ex. D at ¶ 21.)  Electrolux takes issue with the fact that Parsons does *not* mention a design defect in Electrolux's, or any other manufacturer's, dryers.  (Def.'s Mem. in Supp. 16.)  But both of these cases are class actions alleging that home improvement stores improperly installed dryers by failing to use the vents mandated by the manufacturers.  *See Kaiser-Flores v. Lowe's Home Ctrs., Inc.*, No. 5:08-CV45-V, 2009 WL 762198, at *1 (W.D.N.C. Mar. 19, 2009); *Goldstein v. Home Depot U.S.A., Inc.*, 609 F. Supp. 2d 1340, 1342 (N.D. Ga. 2009).  Therefore, in these cases, there was no reason for Parsons to opine as to a defective design.

Parsons's data or the veracity of the facts he relied on—such as its allegations that Parsons's data set was biased or non-representative—go toward the *weight* of Parsons's testimony, not its admissibility. *See, e.g.*, *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F. Supp. 2d 1104, 1119-20 (N.D. Ill. 2005) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect only the weight to be assigned that opinion rather than its admissibility.")

    *1. Parsons's Opinions on Defective Design are Reliable*

Electrolux also argues that Parsons's opinions on defective design are not the product of a reliable methodology. Parsons indicated in his report that he used the methodology outlined in NFPA 921, *Guide for Fire and Explosion Investigations*, published by the National Fire Protection Association ("NFPA"), which utilizes the scientific method. (Parsons Report 3.) "Courts throughout the country have recognized that NFPA 921 offers a comprehensive, peer-reviewed, and detailed guide for fire investigation, and have held that its methodology is reliable for purposes of Rule 702." *Citizens Ins. Co. v. LG Elecs. USA, Inc.*, No. 3:11-cv-40-RLY-WGH, 2012 WL 3294962, at *3 (S.D. Ind. Aug. 10, 2012); *see, e.g.*, *Rager*, 2010 WL 5393857, at *8; *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 2:06-cv-1186, 2008 WL 3891259, at *6 (W.D. Pa. Aug. 19, 2008) (noting that the scientific method reflected in NFPA 921 has been "peer reviewed and widely accepted in forensic fire investigation"); *Layton v. Whirlpool Corp.*, Nos. 3:05-0473, 3:05-0503, 2007 WL4792438, at *3 (S.D. W. Va. Feb. 9, 2007) ("NFPA 921 is a peer reviewed and generally accepted standard in the fire investigation community."); *Travelers Indem. Co. v. Indus. Paper & Packaging Corp.*, No. 3:02-CV-491, 2006 WL 1788967, at *4 (E.D. Tenn. June 27, 2006) ("[E]xpert testimony has been held to be consistent with NFPA 921 and satisfy Daubert without independent testing.").

Nevertheless, Electrolux argues that NFPA 921 provides a methodology for identifying the cause and origin of fires, but not for the evaluation or testing of theories about product design, defects, warnings, or instructions.  (Reply in Supp. of Def. Electrolux Home Prods. Inc.'s Mot. to Preclude the Trial Test. of Ronald L. Parsons ("Def.'s Reply") 7-8.)

The scientific method that NFPA 921 recommends for investigating the cause of a fire consists of the following seven steps: "(1) identify the problem; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis; (6) test the hypothesis; and (7) following any repeated rounds of refining and testing the hypothesis, select the final conclusion." *United States v. Aman*, 748 F. Supp. 2d 531, 535 (E.D. Va. 2010) (citing NFPA 921 § 4)).  In this case, Parsons did just that.  First, Parsons identified and defined the problem as determining "the cause of the fire and . . . whether the subject Electrolux dryer was involved in the fire cause and/or to identify a sub-component within the Electrolux [dryer] that [was] related to the fire cause."  (Parsons Report 3.)  Parsons collected data by reviewing photographs from the scene and forensic reports from other fire investigators who had conducted on-site exams and examining and dismantling the Slabachs' dryer.  (*See* Parsons Report 6-24.)  He then analyzed this data and determined that the fire originated within the Electrolux dryer, that the first fuel ignited was lint behind the drum that was ignited by the gas burner, and that "[t]he charred lint observed behind the drum [was] indicative of this lint being ignited and pulled into the drum during operation, which in turn ignited the load and/or lint and other secondary fuels at the plastic trap duct to the front of the drum."  (Parsons Report 24; *accord* Parsons Report 4.)

Parsons then developed a hypothesis that "[t]his fire event occurred *because* the defective design of the subject Electrolux dryer allows for lint to collect behind the drum in direct

18

proximity to the heat source where it is neither visible nor accessible by the user." (Parsons Report 4 (emphasis added).) He further tested his hypothesis by examining lint accumulation in several exemplar dryers and performing tests on Electrolux dryers and other design alternatives to compare the lint accumulation. NFPA 921 contemplates such exemplar testing. *See Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 645 (8th Cir. 2009) ("NFPA 921 suggests that fire theories involving an appliance be substantiated by testing of exemplar appliances."). As such, Parsons's theory of product design defect was developed from conducting an origin and cause analysis of the Slabachs' dryer that employed NFPA 921's accepted methodology—the scientific method.

Morever, an application of *Daubert*'s non-exhaustive list of factors further establishes that Parsons's methodology is reliable.

### a. Testability

One of the key questions in the reliability analysis is whether a theory can be or has been tested. *Daubert*, 509 U.S. at 593. Here, Parsons has extensively tested his lint ignition theory in a *number* of different categories of testing. (*See* Parsons Report 95-99.) Specifically, he has conducted comprehensive testing establishing that lint ignited by the gas burner flame will ignite lint that has collected in the heat diffuser and on the back of the drum. (*See* Parsons Report 28-31; Parsons Dep. 52-70); *see also Rager*, 2010 WL 5393857, at *8 ("Parsons's theory consists of a testable hypothesis: lint that accumulates behind the dryer drum can come into contact with the heat coil and ignite a fire that ultimately spreads to the dryer load. Parsons has tested this hypothesis on numerous occasions, both before and after the present case came to his attention. Indeed, Parsons testified that he has conducted over one thousand hours of testing.").

Moreover, as to Parsons's opinions regarding alternative designs, he has designed, constructed, and tested one alternative design—which can be retrofitted to existing Electrolux dryers—and suggested a complete redesign, utilizing Maytag's design type, which he has not tested. Although "testing an alternative design will likely be advantageous in demonstrating that the proposed expert's testimony is reliable," testing is not "an absolute prerequisite to the admission of expert testimony"; a proposed expert's testimony regarding an alternative design may be reliable despite a lack of testing "because the expert has adhered to the 'standards of intellectual rigor that are demanded in [his] professional work,' such as relying on the data generated by other researchers, making proper personal observations, or taking other appropriate actions." *Winters*, 498 F.3d at 742-43 (quoting *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir. 1996)).

In the instant case, Parsons's retrofit alternative design has been constructed and tested (*see* Parsons Report 71-76), and the testing found that the cost-effective and simple retrofit retained the same average drying time as an unmodified Electrolux gas dryer (Parsons Report 72-73), thereby demonstrating its feasibility. The feasibility of this retrofit further suggests that Parsons's opinion on this point is reliable. *Rager*, 2010 WL 5393857, at *15.

Regarding Parsons's opinion on the complete redesign, which has not been tested, Parsons's personal observations of the components parts of different dryer models, garnered after thousands of hours examining dryer designs, render his opinions concerning this alternative design reliable, even in the absence of testing. *See Winters*, 498 F.3d at 742-43. And Parsons's proposed alternative design employs the same concept as the Maytag design (Parsons Report 71), which is purportedly used by the majority of today's dryer manufacturers (Parsons Report

64). As such, under these circumstances, Parsons's failure to test his complete redesign does not render his opinion inadmissible. *See, e.g.*, *Rousu v. Rubbermaid Commercial Prods., LLC*, No. 09-1987 (MJD/LIB), 2011 WL 884125, at *4 (D. Minn. Mar. 14, 2011) ("[E]xpert testimony can be admissible without testing[ ] if the expert's proposed alternative design is in service in the market."); *Rager*, 2010 WL 5393857, at *15 ("Evidence of industry practice has been identified as helpful indicia of reliability in products liability cases.").

Despite Parsons's extensive testing, Electrolux objects to its substance, arguing that the testing does not establish that lint accumulates in the heater pan or that it is ignited by a nearby heat source, suggesting that Parsons has rigged his tests, and noting that his only successful ignition occurred in an electric, and not a gas, dryer. (Def.'s Mem. in Supp. 2-3, 10, 19.) The *Rager* court rejected a similar argument that Parsons rigged his tests by dropping balls of lint into the back of the dryer. *Rager*, 2010 WL 5393857, at *10. While this might be a basis for cross-examination, "this aspect of Parsons's testing, which simply facilitates the lint's contact with the heating element" does not render his methodology unreliable or make his testimony inadmissible. *Id.*; *see also Allstate Ins. Co.*, 2008 WL 3891259, at *8 (stating that any differences between the natural buildup of debris in a toaster and the expert's simulation, which involved placing frosting directly on the allegedly defective rod, were "a proper subject for cross-examination, not exclusion").

Similarly, Electrolux's objection to the testing based on Parsons's use of an electric dryer rather than a gas one is yet another basis for cross-examination, not exclusion. *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents

21

through cross-examination.").  Therefore, since Parsons's theory is capable of being tested, and in fact has been tested, the first factor weighs in favor of its admissibility; Electrolux's substantive challenges will have to wait for cross-examination.  *See* FED. R. EVID. 702, Advisory Committee Notes, 2000 Amendments ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." (quoting *United States v. 14.38 Acres of Land Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996))).

### b. Peer Review and Publication

Electrolux next argues that none of Parsons's visual or physical testing has been peer-reviewed or published.  (Def.'s Mem. in Opp. 20.)  Although Parsons's "particular lint ignition theory has not been subject to peer review, it is based on a methodology that is sufficiently reliable for purposes of admissibility," *Rager*, 2010 WL 5393857, at *8—NFPA 921, which Parsons testified is the "only consensus peer-reviewed documentation for fire investigators to follow" (Parsons Dep. 82).  *See also Allstate Ins. Co.*, 2008 WL 3891259, at *5 ("The general methodological framework under which Wald performed his tests, the 'scientific method' reflected in NFPA 921, *has been* peer reviewed and widely accepted in forensic fire investigation." (emphasis in original)).  Furthermore, State Farm points to two independent agencies that have reached conclusions consistent with Parsons's—the Consumer Product Safety Commission ("CPSC") and the NFPA.  (Pl.'s Mem. in Opp. 21-22.)  Although Electrolux contends that State Farm improperly cites to the CPSC's 2003 report on lint ignition in electric clothes dryers (Def.'s Reply10-11), it does not dispute that the NFPA has recognized the dangers associated with lint collection inside clothes dryers (Pl.'s Mem. in Opp. 21-22 (citing NFPA 921 § 24.6.13.1 (2011))).

Parsons further testified that an in-house peer review was conducted specifically on the Slabachs' dryer and that the Wright Group's findings on Electrolux dryer design issues have been reviewed with other laboratories and fire investigators. (Parsons Dep. 81-83.) Parsons explained the process of peer-review utilized in his field as the following:

> [F]or us, we don't write a document, send it out to the community and wait for the information to come back. That's not reasonable or cost-effective in our field. So it's more of a technical review, which means we run our opinions and our data and our information, and that knowledge is discussed with other technical people in the field so that we can get their input and their evaluation as to the type and amount of data that we collected and the opinions that we formed as a result of that data and then how we tested those opinions.

(Parsons Dep. 85-86.) Thus, Parsons's opinions have undergone *some* peer-review process, and, even if it was not a formal one, "lack of peer review will rarely, if ever, be the single dispositive factor that determines the reliability of expert testimony." *Smith*, 215 F.3d at 720.

Furthermore, although Parsons admitted that none of the theories or opinions in his report have been published or submitted for publication, as *Daubert* recognized, "[p]ublication (which is but one element of peer review) is not a *sine qua non* of admissibility . . . . Some propositions . . . are too particular, too new, or of too limited interest to be published." *Daubert*, 509 U.S. at 593. In this case, the lack of publication or formal peer-review does not weigh against the admissibility of Parsons's opinions, particularly when he employed a peer-reviewed methodology in reaching his conclusions. *See Amakua Dev. LLC v. Warner*, No. 05 C 3082, 2007 WL 2028186, at *8 (N.D. Ill. July 10, 2007) ("[A]lthough Mr. Wallace may not have subjected his 'theory' or 'technique' to peer review and publication . . . this would not appear to be relevant, particularly if he is simply applying standard techniques from his field that do not warrant publication."); *United States v. Allen*, 207 F. Supp. 2d 856, 866 (N.D. Ind. 2002) (finding that the methodology of

footwear impression evidence was reliable when the techniques were generally accepted in the forensic community and the methodologies described were subject to peer review).

### c. Error Rate

The known or potential rate of error is most helpful in cases dealing with a particular scientific technique. *Daubert*, 509 U.S. at 594 (citing *United States v. Smith*, 869 F.2d 348, 353-54 (7th Cir. 1989) (surveying studies of the error rate of spectrographic voice identification technique)); *see United States v. Havvard*, 260 F.3d 597, 601 (7th Cir. 2001) (considering error rate of fingerprint analysis). As Parsons's opinions do not involve a particular scientific technique, the error rate analysis is inapplicable here.

### d. General Acceptance in the Community

The general acceptance of a scientific theory in the relevant community can have a bearing in determining admissibility of expert testimony, but it is not an absolute prerequisite to admissibility. *Daubert*, 509 U.S. at 588, 594. Imposing such a rigid general acceptance requirement would be "at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'" *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 3:09-md-02100-DRH-PMF, 2011 WL 6302889, at *9 (S.D. Ill. Dec. 16, 2011) (quoting *Daubert*, 509 U.S. at 588).

Here, Parsons's theories of lint ignition and product defect have been previously posited by him and other experts in other federal courts and have been accepted by those courts as meeting the *Daubert* standard. *See State Farm Fire & Cas. Co.*, No. 1:10-cv-3901 (E.D.N.Y. Aug. 22, 2012) (attached as Ex. 1 to Docket # 114); *Phila. Contributionship Ins. Co.*, No. 2:10-cv-2045, Docket # 69 (attached as Ex. F to Pl.'s Mem. in Opp.); *Rager*, 2010 WL 5393857, at *8-

9; *Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.*, 150 F. Supp. 2d 360, 364-67 (D. Conn. 2001) (holding that expert's opinions that the design of the GE dryer permitted the accumulation of lint behind the dryer drum and that the lint that accumulates in this area can be ignited by the dryer's heating elements met the *Daubert* standard of admissibility). And, once again, NFPA 921, which Parsons relied on, is also widely accepted in forensic fire investigation. *E.g.*, *Allstate Ins. Co.*, 2008 WL 3891259, at *6. Thus, as Parsons's theories have been accepted and advanced by others, and are based on a widely accepted methodology, they appear to have garnered some level of acceptance in the relevant community, which cuts in favor of their admissibility.

### 2. *Parsons's Opinions on Warnings Pass* Daubert *Scrutiny*[8]

Electrolux also argues that Parsons's opinion that Electrolux failed to warn users of known fire hazards does not pass *Daubert* scrutiny because Parsons never designed or tested the effectiveness of alternative warnings. (Def.'s Mem. in Opp. 20-21.) In *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532 (7th Cir. 2000), the Seventh Circuit affirmed the exclusion of an expert seeking to opine on inadequate warnings who had never drafted a proposed warning, stating that this "render[ed] his opinion akin to 'talking off the cuff'" and explaining that "experts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data." *Lemons v. Novartis Pharm. Corp.*, 849 F. Supp. 2d 608, 615 (W.D.N.C. 2012) (quoting *Bourelle*, 220 F.3d at 539). Similarly, in *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076 (8th Cir. 1999), the Eighth Circuit affirmed the exclusion of two experts who had not created, designed, or tested an alternative warning device, finding "critical the fact that one of the experts never even

---

[8] Besides testability, the enumerated *Daubert* factors do not seem to apply to Parsons's opinions on warnings. As such, the Court focuses on whether Parsons's opinion on warnings is reasoned, uses the methods of the discipline, and is founded on data, or whether it amounts to simply "talking off the cuff." *See Lang*, 217 F.3d at 924.

read the warnings used and was unaware of their content." *Lemons*, 849 F. Supp. 2d at 615

(construing *Jaurequi*, 173 F.3d at 1084).

Here, however, Parsons has examined the labels affixed to Electrolux dryers, including the

Slabachs' dryer, and has researched and analyzed the user's guides and services manuals

associated with them.  As such, he is personally aware of the content of the labels, guides, and

manuals, and what they do, or do not say, about the fire hazard associated with lint accumulation.

He can also compare and contrast what information the labels and instructions associated with the

Slabachs' dryer said with the information contained in other Electrolux dryers' labels and

instructions.  From this knowledge, Parsons opined that "[t]he warnings on the [Slabachs'] dryer

do not advise the user that lint collects near the heat source and can be a fire hazard."  (Parsons

Report 104.)  Accordingly, Parsons's proposed testimony does not amount to "talking off the

cuff," even though he has not proposed or drafted specific alternative warnings.  But, as

Electrolux points out, Parsons is not a "human factors" expert and, therefore, would not be

qualified to opine as to the wording, style, color, or font of an appropriate warning.  Parsons has,

however, implied that an appropriate warning would "advise the user that lint collects near the

heat source and can be a fire hazard," which is in his realm of expertise.  *See Williams v. Genie

Indus., Inc.*, No. 3:04-CV-217 CAN, 2006 WL 1408412, at *3 (N.D. Ind. May 19, 2006) (noting

that, although the expert did not draft a specific alternate warning, he opined that there were no

warnings dealing with the hazard and that, while not specific, it appeared that the expert was

suggesting that an alternate warning would have included information regarding this hazard).

Therefore, as Parsons's limited opinions on warnings are reasoned, based on the content

and context of the warnings, and founded on the knowledge he gleaned from examining and

analyzing various labels, instructions, guides, and manuals associated with Electrolux dryers, they are sufficiently reliable to be admitted. *See Lemons*, 849 F. Supp. 2d at 615 (distinguishing *Bourelle* and *Jaurequi* and allowing expert who had not drafted alternative warning language to opine as to inadequate labeling when her proposed testimony was reasoned, based on the context and content of the warnings, and on the consideration of alternative language, and did not amount to talking off the cuff). Moreover, many of Parsons's observations in this context are simply factual (like the lack of any warnings on the dryer itself informing the user that lint accumulation can be a fire hazard) and, therefore, are not properly subject to exclusion under Rule 702. *See In re Yasmin & Yaz*, 2011 WL 6302889, at *21 (holding that an expert's factual observations about the content of labels and the discrepancies between different labels was factual testimony not subject to exclusion under Rule 702).

Accordingly, as all of Parsons's opinions are based on sufficient facts and data and a reliable methodology, they satisfy the reliability prong of the *Daubert* analysis.

### C. Parsons's Opinions Are Relevant

But this is not the end of the inquiry; Parsons's testimony must also be relevant, meaning that it will assist the trier of fact with its analysis of any issues involved in the case or in understanding the evidence. *Smith*, 215 F.3d at 718. Such testimony may bear on the ultimate issue in a case or simply *an* issue in the case. *Id.* at 721. Expert testimony is considered "helpful to the jury if it concerns a matter beyond the understanding of the average person." *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 329 (N.D. Ill. 2008) (citations omitted).

Parsons's opinions in this case involving dryer design and defect, the fire hazard created by lint accumulation, and the interplay among these are not matters that are within an average

person's knowledge or experience. His testimony is of a technical nature that involves specialized knowledge of dryer designs and dryers' inner workings. As such, Parsons's proposed testimony would certainly be helpful to the jury since the average person would not have such specialized knowledge or expertise. *See id.*

As to Parsons's opinions on warnings, although expert testimony on warnings is not always required, *see Conley v. Lift-All Co.*, No. 1:03-CV-1200-DFH-TAB, 2005 WL 1799505, at *13 (S.D. Ind. July 25, 2005), the test of relevancy is whether the proposed expert testimony would assist the trier of fact, *Smith*, 215 F.3d at 718. Parsons's warning opinions were formed after analyzing and examining the labels affixed to Electrolux dryers and the instructions in user's guides and service manuals associated with Electrolux dryers. Based on this unique knowledge of Electrolux labels, warnings, and instructions, which the average person is not likely to have, Parsons will testify concerning the hazard that caused the fire in the Slabachs' dryer, what the labels and instructions associated with that dryer did or did not say about that hazard, and what information is contained in other Electrolux dryers' labels and instructions. Such testimony will assist the trier of fact in determining whether the warnings on the Slabachs' dryer were inadequate or defective.

And all of Parsons's opinions also "fit" the facts of this case. He opines as to the cause and origin of the Slabachs' dryer fire, identifying lint as the first fuel for the fire, the location of that fuel, the source of the ignition, and how that first fuel came to be ignited and carried through the dryer drum as to ignite secondary fuels. Parsons further concludes that the dryer's defective design allowed this fire to occur and that there were no warnings on the dryer itself informing a user of this hazard. All of these opinions bear on issues in the case, including State Farm's

allegations that the Slabachs' dryer was designed and manufactured in such a way as to cause a fire within it; was design, manufactured, and assembled to allow lint accumulation in the vent duct and dryer cabinet; and failed to have adequate warnings regarding the potential for the dryer to malfunction and ignite a fire. (Compl. ¶ 8.) Electrolux's arguments concerning Parsons's expertise and the gaps in his testing merely rehash its earlier objections, all of which go to the *weight*, rather than the admissibility, of his testimony. *See Loeffel Steel Prods.*, 372 F. Supp. 2d at 1119-20. Therefore, Parsons's proposed expert testimony is relevant to this case, fulfilling the second prong of the *Daubert* analysis.

Accordingly, as Parsons is qualified to give his opinions, which are based on sufficient facts and data and a reliable methodology, and his opinions would assist the trier of fact in determining a number of issues in this case, his proposed expert testimony is admissible.

## V. CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge RECOMMENDS that Defendant Electrolux Home Products, Inc.'s *Daubert* Motion to Preclude the Trial Testimony of Ronald L. Parsons (Docket # 90) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for Plaintiff and Defendant. NOTICE IS HEREBY GIVEN that within fourteen days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. FED. R. CIV. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL

THE DISTRICT COURT'S ORDER. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th

Cir. 1995); *Egert v. Conn. Gen. Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir. 1990).

SO ORDERED.

Entered this 5th day of November, 2012.

/S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge