# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **STATE FARM FIRE & CASUALTY** | ) | |
| **COMPANY** *as subrogee of* **KELLY SLABACH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 3:08-CV-436** |
| | ) | |
| **ELECTROLUX HOME PRODUCTS, INC.,** *a* | ) | |
| *foreign corporation*, | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

## I. INTRODUCTION

Plaintiff State Farm Fire & Casualty Company insured Kelly Slabach, the subrogee in this action, and her husband.  In August 2006, the Slabachs' clothes dryer, which Defendant Electrolux Home Products, Inc., manufactured, caught on fire, causing considerable property damage to their home.  State Farm paid for the damage and then sued Electrolux to recover the amount paid.  State Farm brings strict product liability, negligence, and breach of warranty claims against Electrolux, all of which are based on its theory that the design of and warnings associated with the Slabachs' Electrolux dryer were defective and unreasonably dangerous.

Electrolux denies these allegations and proffered Dr. Christine Wood as an expert.  State Farm subsequently moved to preclude Dr. Wood from testifying.  (Docket # 92.)  On September 24, 2012, District Court Judge William C. Lee entered an Order pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Northern District of Indiana Local Rule 72-1(b), referring State Farm's motion to the undersigned Magistrate Judge for a Report and

Recommendation.  (Docket # 117.)

For the following reasons, the undersigned Magistrate Judge will recommend that Plaintiff's Motion to Exclude Dr. Christine T. Wood from Testifying at Trial (Docket # 92) be GRANTED IN PART and DENIED IN PART.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

On August 16, 2006, Kelly and Rodney Slabach's dryer caught fire, causing damage to their home and personal property.  (Pl.'s Mem. in Supp. of its Mot. to Exclude Dr. Christine T. Wood from Testifying at Trial ("Pl.'s Mem. in Supp.") 1.)  State Farm insured the Slabachs and paid approximately $234,825.21 for the property damage and their additional losses.  (Pl.'s Mem. in Supp. 1; Compl. ¶ 11.)

The Slabachs' dryer was a gas fired dryer manufactured by Electrolux.  (Pl.'s Mem. in Supp. 1.)  As such, State Farm subsequently brought a subrogation action against Electrolux, alleging that the Slabachs' dryer was defectively and dangerously designed, manufactured, assembled, and sold and failed to have adequate warnings regarding the potential for the dryer to malfunction and ignite a fire.  (*See* Compl. ¶ 8.)

To counter State Farm's claims, Electrolux retained Drs. Christine T. Wood and Duane L. Steffey of Exponent, Inc., to serve as its experts.  (Pl.'s Mem. in Supp. 4-5.)  Drs. Wood and Steffey co-authored a written report entitled, "Evaluation of Fire Risks Associated with Clothes Dryers: Electrolux Dryers and All Dryers."[1]  (Pl.'s Mem. in Supp. 5.)  In the report,[2] Drs. Wood

---

[1] Electrolux has advised State Farm that it is not calling Dr. Steffey to testify at trial and has withdrawn him as a testifying witness.  (Pl.'s Mem. in Supp. 5 n.3, n.5.)

[2] Drs. Wood and Steffey's report is attached as Exhibit C to State Farm's memorandum in support of its motion and is hereinafter referred to as "Dr. Wood Report."

and Steffey opine that 1) "[t]he risk of dryer-involved fire reported for Electrolux clothes dryers is statistically significantly lower than the risk of fires for all models of clothes dryers from any manufacturer"; and 2) "[r]elative to fire rates for all clothes dryers, Electrolux clothes dryers are not an unreasonably dangerous product."[3]  (Dr. Wood Report 8.)  Dr. Wood also issued a second written report concerning the warnings and safety information that Electrolux provided in the owner's guide, operating instructions, and product labels associated with its dryers.[4]  (Pl.'s Mem. in Supp. 14.)  Specifically, Dr. Wood opines that Electrolux's warnings and safety information were reasonable and adequate in content, location, and format and were not defective.  (Dr. Wood Warnings Report 6.)

Dr. Wood received a Ph.D in experimental psychology and a B.A. in psychology from Stanford University.  (Dr. Wood Report App. B at 18.)  She works at Exponent as a Principal Scientist and Director of the Human Factors Practice.  (Dr. Wood Report App. B at 18.)  She has spent nearly twenty years researching the impact of safety and health-related information on human behavior and injury reduction and has analyzed, evaluated, and developed safety information for many different products, including consumer products, medical devices, work place equipment, and motor vehicles.  (Dr. Wood Report App. B at 18.)  Much of Dr. Wood's work focuses on issues related to child safety, such as the risk of child-play lighter fires.  (Dr. Wood Report App. B at 18; Dr. Wood Dep. 7.)

Dr. Wood has performed risk analysis for child-play fires as well as fires involving

---

[3] Drs. Wood and Steffey also offered a third opinion—that nearly one-third of dryer fires involve consumers failing to clean the dryer (Dr. Wood Report 8)—but Electrolux has since withdrawn this opinion (Electrolux's Resp. in Opp. to Mot. to Exclude Test. of Christine Wood Ph.D ("Def.'s Resp. in Opp.") 9.)

[4] Dr. Wood's warnings report is attached as Exhibit A to Electrolux's response in opposition to State Farm's motion and is hereinafter referred to as "Dr. Wood Warnings Report."

kitchen ranges, smoke detectors, and dishwashers. (Dr. Wood Dep. 7-8.) She is a member of the Society for Risk Analysis and has published several articles on risk analysis, including the rollover risk for pickup trucks, playground hazard risks, and the risks from the occupational use of extension ladders. (*See* Dr. Wood Report App. B at 20-23.)

Dr. Wood has also analyzed injury and illness, adverse event, and accident data from a wide range of sources and used quantitative analyses to develop and assess the effectiveness of safety information and dissemination methods. (Dr. Wood Report App. B at 18.) She has further presented quantitative analyses of accident patterns for individual products to regulatory agencies and has designed and collected data using written questionnaires, interviews, and group discussions. (Dr. Wood Report App. B at 18.) Before joining Exponent, Dr. Wood held a number of research positions. (*See* Dr. Wood Report App. B at 18.)

On March 1, 2012, State Farm moved to exclude Dr. Wood from testifying at trial, arguing that she is not qualified to render her proffered opinions that the risk of fires involving Electrolux dryers is statistically lower than risk of fires for other manufacturers' dryers and that Electrolux dryers are not unreasonably dangerous (Pl.'s Mem. in Supp. 5); that her methodology in reaching these opinions was unreliable (Pl.'s Mem. in Supp. 6-12); and that her opinions on warnings were also unreliable (Pl.'s Mem. in Supp. 14-18). Electrolux responded, countering State Farm's arguments. (Docket # 97.) In its reply (Docket # 102), State Farm also argues that Dr. Wood's statistical opinions do not fit the facts of the case. (Pl.'s Reply Mem. in Supp. of its Mot. to Exclude Dr. Christine T. Wood from Testifying at Trial ("Pl.'s Reply") 6.)

### III. APPLICABLE LAW

The admissibility of expert evidence is governed by Federal Rule of Evidence 702,

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007). Rule 702 provides that following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

*Daubert* requires a district court to exercise a "gatekeeping" function to ensure that expert testimony is both reliable and relevant pursuant to Rule 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010); *see generally Daubert*, 509 U.S. at 589-92; *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006); *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003). This inquiry applies not only to scientific testimony, "but to all kinds of expert testimony." *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002) (noting that Rule 702 "makes no distinction between 'scientific' knowledge and other forms of specialized knowledge" (citing *Kumho Tire*, 526 U.S. at 149)). The fundamental purpose of the gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

According to the Seventh Circuit Court of Appeals, to gauge reliability, "the court is to determine whether the expert is qualified in the relevant field and . . . examine the methodology the expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718

(7th Cir. 2000).  When determining whether an expert is qualified, the court should consider her

"full range of practical experience as well as academic or technical training . . . ."  *Trs. of Chi.*

*Painters & Decorators Pension v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 788

(7th Cir. 2007) (quoting *Smith*, 215 F.3d at 718).  Nevertheless, "[a] court's reliability analysis

does not end with its conclusion that an expert is qualified to testify about a given matter . . . .

[T]he court's gatekeeping function [also] focuses on an examination of the expert's

methodology."  *Smith*, 215 F.3d at 718; *see also Winters*, 498 F.3d at 742.  Accordingly, "[an]

expert['s] work is admissible only to the extent it is reasoned, uses the methods of the discipline,

and is founded on data.  Talking off the cuff—deploying neither data nor analysis—is not an

acceptable methodology."  *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

The court's focus must be solely on the principles and methodology the expert used and not on

the conclusions generated.  *Winters*, 498 F.3d at 742; *see also Smith*, 215 F.3d at 718 ("The

soundness of the factual underpinnings of the expert's analysis and the correctness of the

expert's conclusions based on that analysis are factual matters to be determined by the trier of

fact . . . .").

Specifically, *Daubert* outlined the following, non-exhaustive factors to guide district

courts in assessing an expert's methodology:

> (1) whether the theory has been or is capable of being tested; (2) whether the
> theory has been subjected to peer review and publication; (3) the theory's known
> or potential rate of error; and (4) the theory's level of acceptance within the
> relevant community.

*Bielskis v. Lousiville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (quoting *Daubert*, 509 U.S.

at 593-94).  At the same time, this inquiry is fact-dependent and flexible; the district court is

given "wide latitude in performing its gate-keeping function and determining both how to

measure the reliability of expert testimony and whether the testimony itself is reliable." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (quoting *Bielskis*, 663 F.3d at 894).

But even if an expert's testimony is deemed reliable, it must be excluded if it is not relevant, which means under Rule 702 that it is not likely "to assist the trier of fact to understand the evidence or determine a fact in issue . . . ." *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996); *see also United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007). Stated another way, "the suggested . . . testimony must 'fit' the issue to which the expert is testifying." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (quoting *Porter v. Whitehall Labs. Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)). If the proposed expert testimony satisfies the *Daubert* threshold of both relevance and reliability, "the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596). "The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence." *Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 921 (N.D. Ind. 2006).

Moreover, when determining whether an expert's testimony is admissible, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (citing *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997)). As the Supreme Court wrote: "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. Stated another way, an expert "who invokes 'my

expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elec. Corp. v. WH-T Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *see also Mamah*, 332 F.3d at 478 ("The court is not obligated to admit testimony just because it is given by an expert."). Indeed, the Seventh Circuit has consistently held that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zenith Elec. Corp.*, 395 F.3d at 419-20 (collecting cases).

## IV. DISCUSSION[5]

State Farm challenges Dr. Wood's qualifications to render statistical opinions, the reliability of the methodology she used in reaching her opinions on both statistics and warnings, and the relevancy of her opinions on statistics. State Farm's attack on Dr. Wood's statistical opinions ultimately have merit, warranting their exclusion. Dr. Wood's warnings opinions, however, are admissible.

### A. Dr. Wood Is Qualified to Render Her Opinions on Statistics

State Farm concedes that Dr. Wood is qualified to opine on warnings (Pl.'s Reply 1) and attacks only her qualifications to render the statistical opinions in her joint report with Dr.

---

[5] A district court enjoys wide latitude in performing its gatekeeping function and deciding how to determine the reliability of an expert's testimony. *Bielskis*, 663 F.3d at 894; *In re Syed*, 238 B.R. 133, 142 (N.D. Ill. 1999). As such, a *Daubert* hearing was not held on this motion as the record was sufficient to allow the Court to decide the *Daubert* issues without one. *Olinger v. U.S. Golf Ass'n*, 52 F. Supp. 2d 947, 948 (N.D. Ind. 1999); *accord Mitchell v. Iowa Interstate RR Ltd.*, No. 07-1351, 2010 WL 2179715, at *3 (C.D. Ill. May 26, 2010) (finding that a *Daubert* hearing was not required where the record was more than adequate to conduct a *Daubert* examination without a hearing); *see generally In re Syed*, 238 B.R. at 142 (stating that a court is not required to hold a full *Daubert* hearing each time a party offers expert testimony). The parties do not indicate why such a hearing is necessary or what missing information a hearing would supply, and, according to the Seventh Circuit, this Court is not required to conduct a *Daubert* hearing. *See Target Mkt. Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 n.3 (7th Cir. 1998) (finding that nothing in *Daubert* required district courts to conduct *in limine* hearings concerning every proffer of expert testimony and that a hearing was not necessary when the district court had the expert's report and all the documents upon which the report drew before it and the movant did not indicate what missing information a hearing would supply); *see also Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067-68 (7th Cir. 1998) (holding that "the district court had a sufficient basis for her decision without holding a hearing" and that "[w]e have not required that the *Daubert* inquiry take any specific form").

Steffey (Pl.'s Mem. in Supp. 5-6; Pl.'s Reply 5-6).  To review, Drs. Wood and Steffey opined

that the risk of dryer fires reported for Electrolux dryers is statistically significantly lower than

the risk of fires for all manufacturers' dryers and that relative to fire rates for all dryers,

Electrolux dryers are not unreasonably dangerous.  (Dr. Wood Report 8.)  State Farm argues that

Dr. Wood does not have the required "knowledge, skill, experience, training or education" to

render these opinions because she has little education or background in statistics, the actual

design of household appliances, product defect analysis, or fire sciences.  (Pl.'s Mem. in Supp.

5.)

But "[a] witness may qualify as an expert even if the opposing counsel can point to

deficiencies in his or her qualifications." *Traharne v. Wayne/Scott Fetzer Co.*, 156 F. Supp. 2d

697, 706 (N.D. Ill. 2001).  First, Dr. Wood is not offering any opinion as to whether Electrolux

dryers are defective; her opinions are limited to what she concluded about the risk of fires

involving Electrolux dryers and dryers in general after a statistical analysis (*see* Dr. Wood

Report 2 ("Exponent was retained to perform statistical analyses of the risk of fire involving

Electrolux clothes dryers and clothes dryers in general . . . .")).  Despite her limited experience

with dryers particularly, Dr. Wood has performed similar product risk analysis of fires involving

kitchen ranges, smoke detectors, and dishwashers.  (Dr. Wood Dep. 7-8.)  She has also published

a number of articles on risk analysis.  (*See* Dr. Wood Report App. B at 19-21.)  And, although

State Farm takes issue with the fact that Dr. Wood is not a statistician (*see* Pl.'s Reply 3), as a

highly educated psychologist, Dr. Wood has considerable knowledge in the area of statistics (Dr.

Wood Dep. 4).

While Dr. Wood could certainly have more qualifications to opine in the area of

statistics, "[t]he requirement that an expert be qualified by knowledge, skill, experience, education or training should not be viewed as being particularly rigorous." *Traharne,* 156 F. Supp. 2d at 706.  Indeed, "an adequately qualified witness need not specialize in the field in which the opinion is offered." *Norwest Bank, N.A. v. Kmart Corp.*, No. 3:94-CV-78RM, 1997 WL 33479072, at *2 (N.D. Ind. Jan. 29, 1997) (citing *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 783 (3d Cir. 1996)); *see also Dairyland Power Coop. v. United States*, No. 04-106 C, 2008 WL 5122339, at *10 (Fed. Cl. June 20, 2008) ("An expert need only be qualified and need not be the best and the brightest for testimony to be admissible."); MATTHEW BENDER & CO., INC., FEDERAL RULES OF EVIDENCE MANUAL § 702.02 (2012) ("[C]ourts have not required a party to show that the witness is an outstanding expert, or to show that the witness is well-known or respected in the field; these are generally questions of weight.").

Therefore, Dr. Wood's knowledge of statistics from her psychology background along with her experience conducting product risk analysis similar to that performed in this case qualify her, at least under these circumstances, to offer the disputed opinions on statistics. *See Smith*, 215 F.3d at 718 ("While extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." (internal quotations and citations omitted)); *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Conn*, 297 F.3d at 556 (stating that "genuine expertise may be based on experience or training").  Ultimately, however, whether Dr. Wood is qualified to render statistical opinions is irrelevant as the methodology she used in conducting her comparative

analysis is unreliable, necessitating the exclusion of these opinions.

### B. Dr. Wood's Statistical Opinions Are Based on an Unreliable Methodology

Besides attacking Dr. Wood's qualifications, State Farm also argues that Dr. Wood used an unreliable methodology in conducting her comparative analysis of the risk of fire involving Electrolux dryers and dryers in general, which then led to her conclusion that Electrolux dryers are not unreasonably dangerous. (*See* Pl.'s Mem. in Supp. 6-12.) Specifically, State Farm contends that, in conducting her statistical analysis, Dr. Wood used data that was obtained from completely different sources and is inherently and significantly different in kind and scope. (Pl.'s Mem. in Supp. 7.) While she obtained her information on the number of fires involving all manufacturers' dryers from the March 2009 National Fire Protection Association ("NFPA") report (which derives its estimates from the National Fire Reporting System ("NFIRS")), Dr. Wood derived the number of fires involving Electrolux dryers solely from Electrolux, which related the number of dryer fires reported to it. (Pl.'s Mem. in Supp. 9-10.) According to State Farm, this amounts to "comparing apples and oranges" and necessarily skews the data in favor of Electrolux. (Pl.'s Mem. in Supp. 11.) State Farm further argues that Dr. Wood's second opinion—that Electrolux dryers are not unreasonably dangerous—is a function of the same flawed statistical analysis and should also be excluded. (Pl.'s Mem. in Supp. 12.) In defense of Dr. Wood's statistical opinions, Electrolux argues that she used the best data available and that this data is typical of the data manufacturers use when performing a statistical risk analysis. (Def.'s Resp. in Opp. 6-7.)

The *Daubert* "framework for assessing expert testimony is applicable to social science experts, just as it applies to experts in the hard sciences." *Tyus v. Urban Search Mgmt.*, 102 F.3d

256, 263 (7th Cir. 1996). And although "the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case," *Kumho Tire*, 526 U.S. at 141 (citations omitted), "the methodology used by social science experts to reach their conclusions must 'adhere to the same standards of intellectual rigor that are demanded in [their] professional work' in order to be reliable," *Obrycka v. City of Chicago*, No. 07 C 2372, 2011 WL 2600554, at *8 (N.D. Ill. June 29, 2011) (quoting *Chapman*, 297 F.3d at 688).

Nonetheless, while Federal Rule of Evidence 702 is the "primary locus" of the court's gatekeeping role, *Daubert*, 509 U.S. at 590; *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999), *Daubert* also cautioned judges assessing expert testimony to be mindful of other applicable rules, such as Federal Rule of Evidence 703, which allows an expert to base an opinion on information that is not itself admissible so long as it is the kind of information on which other experts in the field rely, *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 801 (N.D. Ill. 2005) (citing *Daubert*, 509 U.S. at 595); *see* FED. R. EVID. 703. At the same time, "if the data underlying the expert's opinion is 'so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded.'" *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726 (E.D. Wis. 2008) (quoting *In re TMI Litig.*, 193 F.3d at 697).

Furthermore, Rule 703 was "not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Loeffel Steel Prods.*, 387 F. Supp. 2d at 808 (citations omitted). As such, an expert's proffered opinion that merely parrots information provided to her by a party is generally excluded. *King-Indiana*

*Forge, Inc. v. Millennium Forge, Inc.*, No. 1:07-cv-00341-SEB-DML, 2009 WL 3187685, at *2

(S.D. Ind. Sept. 29, 2009) (citing *Black & Decker v. Bosch Tools*, No. 04 C 7955, 2006 WL

5156873, at *1 (N.D. Ill. Sept. 8, 2006)).  Moreover, "when an expert relies upon information

given to him by a party or counsel, [she] must independently verify that information before

utilizing it in [her] calculations."  *Id.* (citation omitted); *see Lyman*, 580 F. Supp. 2d at 726

(excluding expert testimony where expert failed to verify the reliability of data given to him by

counsel).

   Although "[t]here is a fine line between a court finding that proffered expert testimony is

'unpersuasive' (and capable of being submitted to a jury) and when a court concludes that

evidence is wholly 'unreliable' (and properly excludable under *Daubert*)," *Fail-Safe, L.L.C. v.

A.O. Smith Corp.*, 744 F. Supp. 2d 870, 887 (E.D. Wis. 2010), here, Dr. Wood's testimony on

statistics falls on the side of being unreliable rather than merely unpersuasive.  In her report, Dr.

Wood compared the risk in the United States of dryer fires *reported* to Electrolux for its dryers

to the risk posed by all models of dryers from all manufacturers.  (Dr. Wood Report 4.)  She

determined the "adverse event" risk ratio by dividing the number of adverse events (dryer fires)

by the amount of exposure (the number of dryers in use).  (Dr. Wood Report 4-5; Dr. Wood Dep.

11-12.)  Dr. Wood indicated that she determined the number of fires involving dryers from all

manufacturers and the number involving only Electrolux dryers from two different sources.  (*See*

Dr. Wood Report 4.)  Data on fires nationwide involving dryers from all manufacturers was

obtained from a NFPA report and was derived from the NFIRS's data, which consists of reports

by firefighters from a sample of fire departments across the country.  (Dr. Wood Report 4; *see*

Dr. Wood Dep. 13-14.)

On the other hand, data regarding the fires involving Electrolux dryers was obtained from Electrolux itself, which compiled reports from consumers, retailers, insurance carriers, and other sources of fire incidents "in which it is claimed that the fire involved an Electrolux clothes dryer." (Dr. Wood Report 4.) Dr. Wood testified that she accepted those numbers as the number of adverse events for Electrolux dryers. (Dr. Wood Dep. 15-16.) Besides the multi-page document that Dr. Wood received from Electrolux providing these numbers, Dr. Wood did not review or rely on any other documents in determining the number of adverse events for Electrolux dryers or do anything further to examine the nature of the sources who reported these fire incidents to Electrolux. (Dr. Wood Dep. 15-17.)

But "[w]hen an expert bases her opinion on information supplied by another," particularly a party, "the Court[ ] must focus on the reliability of the expert's foundation." *Black & Decker*, 2006 WL 5156873, at *1. But despite the fact that this data on the number of fires involving Electrolux dryers supposedly came from Electrolux itself, Dr. Wood admittedly did nothing to independently verify the reliability of this information before she used it in her calculations.[6] This renders her statistical analysis unreliable and justifies excluding the opinions that rely on this information. *See Fail-Safe, L.L.C.*, 744 F. Supp. 2d at 888 (stating that the defendant's expert's reliance on the defendant's own data, which he did not independently verify, rendered his opinion unreliable); *Braun Corp. v. Vintage Mobility Int'l, LLC*, No. 2:06-CV-50-JVB-PRC, 2010 WL 5287484, at *7 (N.D. Ind. June 21, 2010) (recommending exclusion of the portions of the defendant's expert's opinion relying on a histogram prepared by the

---

[6] Indeed, in some instances, Dr. Wood apparently only went "through the law firm representing Electrolux," or Electrolux lawyers to obtain information or clarifications for her statistical analysis. (*See* Dr. Wood Dep. 21.) In fact, for the most part, Dr. Wood is unable to recall direct conversations with any Electrolux employee. (Dr. Wood Dep. 22, 50, 52, 93, 107.)

defendant when the expert used it without verifying or reviewing the underlying information), *report & recommendation adopted*, 2010 WL 5279974 (N.D. Ind. Dec. 17, 2010); *Lyman*, 580 F. Supp. 2d at 726 (providing that an expert should have verified the data underlying the summary of sales data provided by defendant's counsel that he relied on in forming his opinion, and excluding his testimony regarding that information); *see also Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) (affirming exclusion of expert testimony, on grounds that the data underlying his opinion was so unreliable that no reasonable expert could base an opinion on it, where the expert relied on a document but did not know the source or basis of the document).

Dr. Wood's failure to verify the data that Electrolux supposedly supplied to her is not the only fatal flaw in her statistical analysis. When conducting a comparative analysis, to meet the reliability that *Daubert* demands, an expert must "select samples that are truly comparable. To put it another way, care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" *Loeffel Steel Prods.*, 387 F. Supp. 2d at 812 (quoting *Donnelly v. R.I. Bd. of Governors for Higher Educ.*, 929 F. Supp. 583, 591 (D.R.I. 1996)). Here, Dr. Wood obtained the number of fires involving all manufacturers' dryers from the NFPA report, which relies on NFIRS reports by firefighters, but received the number of fires involving Electrolux dryers from Electrolux itself, which provided the number of fires reported directly to it. Regardless of State Farm's argument that Electrolux's data under reports fires in its dryers, Dr. Wood's comparative analysis is fatally flawed because she compared two different *types* of data—(1) the data on all dryer fires derived and estimated from NFIRS reports by fire departments and (2) the data on Electrolux fires derived from only those fires reported to

Electrolux.  Although this second kind of data may be the type that manufacturers rely on in conducting statistical risk analysis, in Dr. Wood's comparative risk analysis in this case, using these two different types of data amounts to a comparison between "apples and oranges," which fails to meet *Daubert*'s reliability standard.  *See id.*

Moreover, while Dr. Wood claims that this was the best available data (Def.'s Resp. in Opp. 6-7), State Farm points out that Dr. Wood *could have* obtained the data on Electrolux dryer fires from the same source as the data on fires involving all manufacturers' dryers because the NFIRS report forms include a section for reporting the brand, model, serial number, and year for the dryer involved in each fire (Pl.'s Mem. in Supp. 10), further suggesting the unreliability of her comparative analysis.  *Cf. Cook Inc. v. Endologix, Inc.*, No. 1:09-cv-01248-TWP-DKL, 2012 WL 3948614, at *5 (S.D. Ind. Sept. 10, 2012) (finding that plaintiff's expert's calculation of a market share was based on reliable data and methods when the defendant did not provide any alternative data that would have been more reliable upon which the expert could have relied). Therefore, because of Dr. Wood's failure to independently verify the data she received from Electrolux and her comparison of two distinctly different types of data, the data underlying her risk analysis opinion is "so unreliable that no reasonable expert could base an opinion on them," justifying the exclusion of her opinions relying on that data.  *Lyman*, 580 F. Supp. 2d at 726 (quoting *In re TMI Litig.*, 193 F.3d at 697).

Dr. Wood's second statistical opinion—that relative to fire rates for all dryers, Electrolux dryers are not unreasonably dangerous—suffers from the same infirmities as her first one.  Dr. Wood testified that this second opinion was simply a function of her statistical analysis as presented in her report.  (Dr. Wood Dep. 45.)  As such, it is also based on unverified data from a

party and a flawed comparative analysis, rendering it unreliable. Without this underlying analysis, Dr. Wood's opinion is nothing more than the "bottom line," which "supplies nothing of value to the judicial process." *See Zenith Elec. Corp.*, 395 F.3d at 419-20. Furthermore, with such an opinion—that Electrolux dryers are not unreasonably dangerous—Dr. Wood improperly opines with respect to an ultimate legal conclusion in the case—whether Electrolux dryers are in fact unreasonably dangerous. *Wielgus v. Ryobi Techs., Inc.*, No. 08 CV 1597, 2012 WL 3643682, at *4 (N.D. Ill. Aug. 23, 2012) (citing *United States v. Sinclair*, 74 F.3d 753, 757, 758 n.1 (7th Cir. 1996)); *see Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (excluding expert testimony that consisted of legal conclusions); *Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1022 (N.D. Ill. 2010) (stating that experts may provide opinions as to the ultimate factual issues in a case, but may not testify as to legal conclusions that will determine the outcome of the case).

And even if Dr. Wood's statistical opinions *were* reliable, they do not fit the facts of this case and, as such, would not assist the trier of fact. *See Chapman*, 297 F.3d at 687; *Hall*, 93 F.3d at 1342. State Farm alleges that the Slabachs' Electrolux gas dryer was defectively designed and that these defects caused lint to accumulate in areas not visible to the user and subsequently ignite. Dr. Wood's report does not address this claim, "but instead compares all Electrolux dryers (regardless of model or type) with all other dryers in the United States (again, regardless of model or type) regarding the frequency of dryer fires." *State Farm Fire & Cas. Co. v. Electrolux N. Am.*, No. 2:10-CV-01147 RSM, 2012 WL 161821, at *3 (W.D. Wash. Jan. 4, 2012) (excluding these same two opinions from Drs. Wood and Steffey because they did not fit the facts of the case). This comparison is not limited to dryer fires caused by lint accumulation;

it also includes all reported dryer fires, regardless of their cause. *Id.* Fires that do not result from lint accumulation near the heat source would not be relevant to "the alleged defects in the [Slabachs'] gas dryer, and a statistical comparison that includes such irrelevant data clearly does not 'fit' the facts of this case." *Id.*

Perhaps Dr. Wood's opinions would be relevant if the question before the Court was whether the Electrolux brand, as a *general* matter, is comparatively safer than other brands, but this is not at issue in this case; rather the central question posed here is whether the specific Electrolux model the Slabachs owned was defective, which Dr. Wood's opinions based on her statistical analysis do not speak to. *Id.* at *4. Accordingly, Dr. Wood's two statistical opinions do not meet the basic relevancy requirements of Federal Rule of Evidence 702 and, therefore, must be excluded on this basis as well. *Id.* at *3.

### C. Dr. Wood's Warnings Opinions Are Sufficiently Reliable

Besides challenging Dr. Wood's statistical opinions, State Farm also moves to exclude Dr. Wood's warnings opinions as unreliable and unsupportable. In her report, after reviewing the owner's guide and operating instructions accompanying the Slabachs' dryer and the warnings on the dryer itself, Dr. Wood states that "[t]he safety information contained within the Electrolux Owner's Guide, Operating Instructions, and on the product clearly communicates the need for proper installation and exhaust, the need to consistently clean and keep the dryer free of lint, and to have authorized personnel clean the dryer approximately every 18 months." (Dr. Wood Warnings Report 5.) She then concludes that the "[w]arnings and safety information about factors associated with the dryer fires provided by Electrolux were reasonable and adequate in content, location, and format and were not defective." (Dr. Wood Warnings Report 6.)

State Farm argues that these opinions are unreliable because Dr. Wood merely accepted information that Electrolux provided to her without independently verifying it (Pl.'s Mem. in Supp. 16) and then deemed the content, location, and format of product literature and labels containing the warnings as reasonable, adequate, and not defective without considering the warnings' origination, designed purpose, intent, wording, or effectiveness (Pl.'s Reply 7).  Along those same lines, State Farm notes that Dr. Wood does not opine about the effectiveness of the warnings and instructions.  Based on this omission, State Farm concludes, without any supporting authority, that "to present evidence to the jury that the warnings are 'reasonable,' 'adequate,' and 'not defective,' even though they very well might be completely 'ineffective' does not meet the evidentiary standards set forth in [Federal Rules of Evidence] 702 and 703." (Pl.'s Reply 9.)  Moreover, State Farm maintains that Dr. Wood's opinions fail to consider whether the warnings identify the hazard of lint accumulating in close proximity to the heat source or the necessity of disassembling the dryer to clean out the lint behind the drum frequently enough to prevent the risk of fire, which—according to State Farm—are the contested issues in the case.  (Pl.'s Reply 7-8.)  And, finally, State Farm argues that Dr. Wood has failed to test her opinions or subject them to peer review or publication.  (Pl.'s Mem. in Supp. 16.)

Regarding State Farm's claim that Dr. Wood merely relied on information Electrolux provided to her without independently verifying it—an argument it successfully made regarding Dr. Wood's statistical opinions—Dr. Wood's use of the safety information in forming her warnings opinions is significantly different than her use of the numbers given to her by Electrolux in her statistical risk analysis.  There, Dr. Wood simply relied on the information Electrolux gave to her and did nothing to verify it "*before utilizing it in [her] calculations*,"

which is impermissible. *Braun Corp.*, 2010 WL 5287484, at *7 (emphasis added). With her

warnings opinions, Dr. Wood reviewed the warnings, owner's guide, and instructions associated

with the Slabachs' Electrolux dryer to reach her conclusions—which is exactly what State

Farm's *own* expert did in coming to his warnings conclusions. Unlike the number of dryer fires

involving Electrolux dryers that Electrolux reported to Dr. Wood, there was nothing to verify

about the safety information. As State Farm itself stated, "the content, location, and format of

the product literature and labels . . . are what they are." (Pl.'s Reply 7.)

As to State Farm's contention that Dr. Wood opines as to the adequacy of the warnings

without considering their origination, designed purpose, intent, wording, or effectiveness, under

Indiana law, when determining the adequacy of warnings, courts consider "the adequacy of the

factual content, the adequacy of the manner in which the content is expressed, and the adequacy

of the method of conveying these expressed facts." *Jarrell v. Monsanto Co.*, 528 N.E.2d 1158,

1162-63 (Ind. Ct. App. 1988) (citing *Ortho Pharm. Corp. v. Chapman*, 388 N.E.2d 541 (Ind. Ct.

App. 1979)); *see generally* AM. L. PROD. LIAB. § 33:3 (3d ed. 2012) (stating that factors relevant

to the adequacy of a warning "include that the warning adequately indicates the scope of the

danger, reasonably communicates the extent or seriousness of the harm that could result from

misuse, and adequately alerts a reasonably prudent person to the danger"). In concluding that

the warnings and safety information associated with the Slabachs' Electrolux dryer were

adequate in content, location, and format, Dr. Wood expressly considered these factors.

Drawing from the *American National Standard for Product Safety Signs and Labels* and

other guidance documents, Dr. Wood indicated that warnings should identify the hazard, the

actions taken to avoid the hazard, and the consequences of failing to take these actions. (Dr.

Wood Warnings Report 3.)  Applying that standard to the factual content of the warnings and instructions here, Dr. Wood found that the safety information clearly identifies fire as a potential hazard; provides numerous steps to reduce this risk, including repeated iterations of the importance of removing lint from the dryer and methods of doing so; and indicates that the consequences of not taking these actions include injury or death.  (Dr. Wood Warnings Report 3.)  As to the manner in which this content is expressed, Dr. Wood noted that the safety information is presented using common formatting techniques that assist the reader in processing information, such as using headings, "signal words," and safety alert symbols.  (Dr. Wood Warnings Report 3.)  And the method used to convey these facts includes giving specific instructions in the owner's guide about preventing fires, required care and cleaning, items that should not be dried, and further drying procedures as well as a customer instruction checklist. (Dr. Wood Warnings Report 3-4.)  Dr. Wood further pointed out that Electrolux provides specific warnings on the inside of the dryer that include a safety alert symbol and the word "WARNING," which instruct users not to dry certain materials and inform them that the dryer produces combustible lint.  (Dr. Wood Warnings Report 4.)

Therefore, despite State Farm's claims to the contrary, Dr. Wood's failure to consider the warnings' origin, purpose, intent, wording, or effectiveness do not make her opinion on their adequacy unreliable as she properly opines on the adequacy of the factual content of the warnings and safety information, the adequacy of the manner in which this content was expressed, and the adequacy of the method of conveying these facts.  *See Jarrell*, 528 N.E.2d at 1162-63.  Furthermore, according to the American Law of Products Liability treatise, "an adequate warning is one that includes the directions, communications, and information essential

to enable the user to use the product safely so that, *had the injured person complied with the warning*, there would have been no injury." AM. L. PROD. LIAB. § 33:3 (emphasis added). This suggests that an adequate warning need not compel compliance or be effective in changing a consumer's behavior. As such, that Dr. Wood does not opine to the *effectiveness* of the warnings when concluding that they are adequate does not mean that she failed to meet the evidentiary standards of Rules 702 and 703. Rather, this is simply a basis for cross-examination. *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination.").

State Farm further maintains that Dr. Wood's opinion fails to address the contested warnings issues in the case—namely whether the warnings identify the hazard of lint accumulating in close proximity to the heat source or the necessity of disassembling the dryer to clean out the lint behind the drum. (Pl.'s Reply 7-8.) But that is State Farm's theory of defective warnings, and Dr. Wood is not required to accept that theory in reaching her conclusions. Nor is a warning required to include an explanation of the exact danger or all the attendant risks that may result in harm. AM. L. PROD. LIAB. § 33:3. Rather, the question is whether the warnings "make apparent the potential harmful consequences" and whether the warning is "of such intensity to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger." *Jarrell*, 528 N.E.2d at 1162 (citation omitted).

In her report, Dr. Wood acknowledges that the NFPA and the Consumer Product Safety Commission ("CPSC") have recognized that lint accumulation within dryers may result in fires and that the CPSC recommends that users clean the lint screen before or after drying each load of

clothes, clean behind the dryer where lint can build up, and have a service person clean the interior of the dryer periodically to minimize lint accumulation. (Dr. Wood Warnings Report 5.) Dr. Wood then concludes that "the warnings and safety information provided by Electrolux induce and emphasize the concerns identified in the analysis of dryer-related incidents conducted by the NFPA and CPSC and Electrolux disseminates this information to purchasers of their clothes dryers." (Dr. Wood Warnings Report 5.) As such, Dr. Wood properly opines as to whether the warnings and safety information "make apparent the potential harmful consequences" of lint accumulation and, with her conclusion that the warnings are adequate in content, location, and format, also opines as to whether the warning appropriately conveys the nature of this risk to consumers so they can exercise the necessary caution. *See Jarrell*, 528 N.E.2d at 1162 (citation omitted).

State Farm's argument that Dr. Wood's opinions have not been tested or subjected to peer review or publication appears to be inappropriate as the "inquiry envisaged by Rule 702 is a flexible one, and a strict application of the *Daubert* factors is not always warranted, especially when the expert relies on [her] experience in the relevant field." *Tober v. Graco Children's Prods., Inc.*, No. 1:02-CV-1682-LJM-WTL, 2004 WL 1987239, at *11 (S.D. Ind. July 28, 2004) (citing *Smith*, 215 F.3d at 719) (finding inappropriate the application of the *Daubert* factors to the opinion of a human factors expert who concluded that a product's warning labels and instructions were inadequate). In the instant case, Dr. Wood "is not providing scientific testimony that can be readily tested by the *Daubert* factors. Instead, Dr. [Wood] relies on [her] extensive experience and expertise in the relevant field." *Id.* As such, a strict application of the *Daubert* factors is not warranted here. *Id.*

Ultimately, State Farm's various challenges to Dr. Wood's opinions concerning the warnings attack the substance of her conclusions rather than the reliability of the methodology she used, and the former (unlike the latter) are something for the jury to consider. *See Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . ."). Undoubtedly, State Farm will have ample opportunity to test the accuracy of Dr. Wood's opinions through the traditional methods at trial, such as vigorous cross-examination, the presentation of contrary evidence, and careful instructions on the burden of proof. *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596); *Tober*, 2004 WL 1987239, at *11. Accordingly, under the circumstances of this case, Dr. Wood's proposed testimony on warnings is admissible.

## V. CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge RECOMMENDS that Plaintiff's Motion to Exclude Dr. Christine T. Wood from Testifying at Trial (Docket # 92) be GRANTED with regards to Dr. Wood's statistical opinions and DENIED concerning Dr. Wood's opinions about the warnings.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for Plaintiff and Defendant. NOTICE IS HEREBY GIVEN that within fourteen days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. FED. R. CIV. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL

THE DISTRICT COURT'S ORDER. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330

(7th Cir. 1995); *Egert v. Conn. Gen. Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir. 1990).

SO ORDERED.

Entered this 5th day of November, 2012.

/S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge